May it please the Court, Greg Sundese, Ford Appellant, TRW. If I may, I'd like to first address the verdict on liability. As this Court is aware, a verdict has to be supported by substantial evidence. But substantial evidence is not just any evidence. What the cases have said is that substantial evidence is proof of what the law requires. Now, in this case, despite the numerous citations provided in both the briefs by both parties, I think what the law requires can really be found in four, maybe five cases. Four of them are from this circuit. One of them is the California Supreme Court case. And why I think those cases are important is that four of them dealt with a facially neutral selection criteria as we have here, a matrix or a ranking system. The cases I'm referring to are the Ninth Circuit case Cotton v. City of Alameda, the Ninth Circuit case of Rose v. Wells Fargo, the Ninth Circuit case of Coleman v. Quaker Oats, and the California Supreme Court case of Goose v. Bechdel Court. All of those cases approach... Wasn't this matrix, wasn't the argument that the matrix was set up to, to, to the purpose of getting rid of Mr. Lee? That's correct, Your Honor. And that, and that, that the, the TRW, it's human resource people, they set out certain criteria for terminating an employee, and that those criteria weren't factored in. And they weren't factored in to this matrix. Okay. The Court addressed or raised two questions, if I may answer those. The first part of it is, yes, TRW came up with a, a selection matrix. And with facially neutral selection criteria, things like RF test and system design and system test, things like that. And all of these cases that I've cited indicate that that, that's really the classical definition of a disparate impact case. You have a, what is on its face neutral, but somehow it has a discriminatory impact on the protected group. In this case, they focused on a few people. Isn't, isn't, isn't facial neutral if they've left out key characteristics of Lee? I mean, you, you use that term facially neutral, but it doesn't look facially neutral if they've set it up so that Lee's qualifications are downgraded. That's, well, again, Your Honor, to respond, the, the criteria selected, all the cases I've cited have said the criteria selected are the prerogative of the employer. Well, but, all right, let's say the prerogative. But then when you look at them, they discriminate against this particular man. That, that's our issue, Your Honor, is because this was a disparate impact case, no matter what you call it, it was a disparate impact model. At, in the brief at pages, I believe it's 10 and 32, the brief says the matrix was rigged or designed to target Lee for layoff. So the question becomes how. Guz, and in the more recent case, the Gross v. FPL Financial, the U.S. Supreme Court case, says that you have to prove that the discrimination was actually based on age. Now, here you have these facially neutral selection criteria, some of which Mr. Lee didn't like. Well, age is just a factor. It's not exclusively based on age. It's a motivating factor. But here there's nothing to suggest that it was based on Mr. Lee's age, as opposed to any other characteristic unique to Mr. Lee. But the jury didn't buy that. The jury didn't buy it. But that doesn't mean the juries don't commit error. Any inferences drawn here, I think we have pointed out, are drawn on factual predicates that the courts have said as a matter of law do not support an inference. Are you challenging any of the jury instructions? We're not challenging the jury instructions. And the jury heard the evidence, and there was argument, and the jury came to a conclusion. There was enough there to send this case to a jury, and the jury decided it. And, you know, this is a pretty tough hurdle to overcome. It's not often, I'm just thinking back, that we're going to overturn a jury's verdict unless there was some error in the instruction, some prejudice that creeped into the trial. Your Honor, I do not delude myself in terms of the difficulty I have in attacking a jury verdict. But that's why there are appellate courts, and that's why there are rules, and that's why the courts have said they have to be supported by a rational inference. The evidence has to be ---- You know, substantial evidence on appellate review, we draw every inference. In favor of ---- In favor of the jury's verdict. And I understand that, Your Honor. But as I think it's the EEOC v. Texas Instruments case says, however, you can't cite a string of separate pieces of evidence, none of which by itself would support an inference of discrimination, and then conclude that because they're cumulated, we somehow have an inference of discrimination. Zero plus zero equals zero. But isn't that the way people think? You put together several pieces of evidence, and they make a pattern. Your brief tries to knock them off one at a time. That's not the way anybody thinks about something like this. They look at the whole. And, Your Honor, what I try to do, though, is deliberately go through each instance or piece of evidence from which we ask there to be an inference drawn, and these courts have held that that will not support an inference of discrimination. Now, and I'm conscious of my time. I don't want to dwell on that. I think I've said it. I've highlighted my point here. I think it's – I've said it out in the opening brief and the reply brief. And I do want to move on to this other point of the punitive damages evidence. But – But, look, you have here direct evidence of Molis that Weaver told him that Weaver was considering Lethe's age with regard to layoff. There's some statistical evidence. It supports an inference of age discrimination. Weaver testified that 21 people were selected for layoff in 1999. Sixty-one percent were over the age of 40. It also offered evidence that 12 of the 14 employees selected for downgrade were over 40. And other examples compared to the six other test engineers considered for layoff, Lee was the oldest and was at least 20 years older than five of the six others. And there was evidence that younger test engineers had weaker performance reviews were ranked higher than Lee in the skill matrix that was used to rank employees. And, you know, there's a lot more. Well, again, Your Honor, I – And there's certainly substantial evidence in the record. And we have to consider that the light most favorable to the successful party. And I appreciate that, Your Honor. If I can conclude this portion by just noting that each one of the instances that the Court just identified, they were addressed. For example, the statistics were based on a flawed statistical sample. Oh, you're making a great mistake. Continue to argue. You've got other points. Okay. My other point is on the punitive damage award and the sufficiency of the evidence there to support the award. Now, again, as this Court is aware, California law requires that there be a showing that the act upon which the punitive damage award was based was itself committed by a managing agent, officer, or director of the corporation, or that that predicate act was ratified by a managing agent, officer, or director. And here, I think we can focus only on managing agent. That's the only thing that's argued by plaintiff. We have three candidates. We have Mr. Molas, who I think, first of all, I can point out was an afterthought. Let's drop him and look at the other two. Okay. The other two, Mr. Weaver was the HR fellow. Mr. Weaver's involvement in this whole thing, as highlighted in Mr. Lee's brief, was he only was involved to take a look at the first iteration of the matrix. After that, he was even left out of the procedure because he didn't see the subsequent iterations. Did he approve using the matrix as opposed to using the criteria that TRW had adopted for instituting layoffs or downsizing? As I recall Weaver's testimony, I don't think he used the word approved. I think he said, I embraced it, I saw what they were doing, and he did not reject it. But Mr. Weaver. Sounds like approval. But the test, yes. That's the way the jury could have taken it. But approval by whom? We have to look at what is the substance of Mr. Weaver. Mr. Weaver described himself, and this is all the uncontradicted. He's described in the evidence as a human resources generalist. Mr. Weaver said it was his duty to ensure that management at TRW followed TRW policies. He described his role as a compliance-type function. Mr. Lee's brief at page 40 says that Weaver acted without corporate oversight, suggesting that even Mr. Lee understands that Mr. Weaver needed corporate oversight to approve his acts, and Lee's counsel at trial asked Mr. Weaver if management had signed off on Lee's layoff and the process, to which Mr. Weaver responded, I can't speak for TRW management. So even at the trial, I think the evidence that was adduced by Mr. Lee does not support the notion that Mr. Lee was a policymaker for TRW. And I will add at this point, this would also apply to the other two, but I think we also have to focus on this policymaking function. The California cases, College Hospital and White v. Ultramar, make it clear that it has to be an enduring corporate policy that transcends the corporation, that becomes the rule of the corporation for some time to come. All of the evidence in this case will only support the notion that what occurred was a one-time aberration that applied in one unit of TRW and affected one individual, Mr. Lee. There's nothing in the evidence to support the notion that this was some enduring or abiding corporate policy of TRW. How many employees does TRW have? At the time, Your Honor, I don't know. I know from my experience that depending on where, because at that point, that facility was mainly in aerospace and defense. They have thousands and thousands. It was 5 to 10,000. It would range depending on what the economy was doing. It's a big company. A big company. So Nakamura was supervising how many? I'm sorry? Nakamura was. I think Nakamura's department, as I recall, I think it was maybe because he had a center, and I think it was in the maybe 50 to 75 range, 50 to 100. I thought it was in the 200 range. I don't think. I think McVeigh's organization was. There was the EPO, which was McVeigh. I think it was in the 200 range. I've never seen that. Well, it could have been. 200 out of 5,000 or so. Yeah. But there's no evidence that this matrix was applied to or affected anyone other than Mr. Lee. But now they did have the authority to depart from what appeared to be corporate policy. Your Honor, and I've had this argument come up before, this departing from. I stumble over the fact, how does somebody who violates a corporate policy or departs from it become an enactor of corporate policy? It's kind of a disconnect for me. It shows that if you believe Mr. Lee's version of it, you have three mavericks out there that are running roughshod over what TRW policy is, which was the formal TRW policy that was pointed to, and you have three people that violate it. Well, okay, then the question becomes, who in TRW management ratified that violation to make it a policy? There's no evidence of that. College Hospital and White v. Ultramar make it clear that for ratification, you have to have evidence of actual knowledge by the corporation of this wrongful act and approval of it. Did anybody have to sign off on Mr. Lee's termination? Other than Weaver and Nakamura. No, Your Honor, there's no evidence of it. Just Mr. Nakamura was all? It was implemented. The matrix was modified, I think, two subsequent times, and then the layoff was implemented. Who decided that there was a need to implement a layoff? As we pointed out in the brief, it was kind of a trickle-down circumstance. CFI and corporate said we need a layoff. Well, I think the evidence would support it. The highest it was was at EPO, the McVeigh level, the organization level, and a instruction went out to let's look down the road and see where our business is going to be a year or two years or three years from now, as this Court may understand from cases of years. In the defense industry, you're always aware of the government contracts coming in and how much contract money do we have down the road, how many heads will we be able to support on an ongoing basis. So the evidence was that's what triggered the analysis, asking these operational people to look at their organizations to see if they were going to be able to support the compliment they had at the time. That's when Nakamura asked the people below him to begin that function of trying to decide what their business was going to require in the months and years to come. Was that a corporate policy statement? I don't think it's a policy statement. I think that's business. That's no different than the corner grocery. I'm sure it gets to the heart of what they do, you know, maintaining business and making sure that profits and losses are all in line. I think at that level, yes, it's a corporate policy. It's a business practice. A mom-and-pop grocery does the same thing. But I think what you have to look at for punitive damage analysis is the wrongful act, the liability-producing act. Was that a corporate policy? And as I said a moment ago, I just can't embrace the notion that a diversion or a violation of a published company policy can, in and of itself, become a policy of the corporation because it happened. I think if the argument is from the plaintiff that these people were out there and there were, you know, just running the town as they saw fit, departing from our standard set of rules, then they have to show or produce evidence of ratification by senior officers, directors, or managing agents. These people don't fit that bill. Moving briefly to Nakamura, Lee's brief at page 39 describes Weaver and Nakamura acted without corporate oversight. At page 39, Weaver and Nakamura decided to ignore TRW's layoff policy. I think those are acknowledgments that these were not the corporate people. These were implementers. They were soldiers, maybe. Maybe they departed. I think departure from the policy is a breach of contract. We have your argument on this well in hand, and you're four minutes over. I appreciate it, Your Honor. Thank you. Good morning. If the Court please, I'm Julian Balingi, appearing on behalf of the appellee, Dr. Edward Y.S. Lee. I want to talk briefly about the sufficiency of the evidence. What I've heard counsel argue essentially is that his evidence supports an inference that there was no age discrimination. This was a disparate treatment case, and that is probably a good argument to make before a trier of fact, but we're not before the trier of fact at this juncture. The issue is whether or not there is substantial evidence in the record to support a finding of age discrimination. Ignoring all evidence favorable to the defense and engaging in every inference that's favorable to the verdict, clearly there is, and I believe the Court in the questioning focused on that evidence, and it's not to be taken piecemeal. It's to be taken as a whole. There's evidence that Dr. Lee's age was discussed and considered in choosing him for layoff. There is evidence that younger, substantially younger test engineers were improperly evaluated more favorably than Dr. Lee in choosing him for layoff. There is evidence that statistically that older employees were disfavored both in the layoff and in downgrading. There is evidence that there was a matrix and ignorance of a digression from corporate policy, which creates an inference of age discrimination, and that that matrix was rigged to target Dr. Lee for layoff because of his age. And, of course, there is evidence that less qualified, substantially younger test engineers were retained instead of Dr. Lee because of his age. All of this supports an inference of age discrimination under the California Supreme Court's holding of Guz v. Bechtel. I want to move to punitive damages. Now, I agree with counsel for the appellant that the issue is whether or not Weaver and Nakamura were managing agents under California law. A managing agent is defined as one who exercises substantial discretion in the issues and decisions that form the basis of the award of punitive damages. And those issues must impact corporate policy. This is a question of fact, as the California Supreme Court tells us in the White v. Ultramar case. So the issue is, is there substantial evidence in the record to support a finding that Nakamura and Weaver are managing agents of TRW? And I submit to the court that there does. First, Weaver and Nakamura could decide when to implement a layoff without corporate oversight. Nakamura testified that he, Weaver, and others in local management decided we had more people in our local staff than programs could support and felt the layoff process was necessary. The decision of when to lay off people and under what circumstances is a matter of corporate policy. Weaver, who is a senior HR manager, is no small player in this scenario. He has HR oversight over 500 employees at TRW. Then the second issue is that these gentlemen had discretion to create their own layoff policy, to create their own criteria of determining who was going to be laid off. That is an issue of corporate policy. Nakamura instructed Molas to create a skills matrix according to the skills we thought were the most appropriate to the business, according to Nakamura's testimony. Now, the issue is corporate oversight. There is nothing in the record that these gentlemen were subject to any corporate oversight, which means what? A trier of fact reasonably could infer that they had absolute discretion to ignore corporate policy, to determine when people could be laid off, to determine who would be chosen for layoff. And as the White v. Ultramar case tells us, that is exactly what a managing agent is. But if they are free to ignore corporate policy, can you say they then are free to make it? If they are free to ignore corporate policy, then they, in fact, are managing agents because by their actions they are creating corporate policy. And if there's, in this record where there's no evidence that they were subject to corporate oversight, a trier of fact could reasonably infer that they were the sole determiners of when and under what circumstances people could be laid off, and as such they are managing agents by definition. You know, the California Supreme Court seems pretty reluctant to recognize punitive damages and to recognize corporate officers as managing agents. If you're trying to apply California law, as I assume we are, I really wonder whether the California Supreme Court would... I would suggest, Judge Noonan, that if this were a case where there was an enforcement mechanism of corporate policy and somehow these fellows slipped under the radar and they had misapplied corporate policy, then perhaps they would not be managing agents. But here where there's no evidence that the corporation took any measures to see that its policies were enforced, then these gentlemen had absolute discretion to determine layoff policy as to when and under what circumstances, and they are managing agents. If the Court has any further questions for me. Now, one point that was not raised by the appellant, but certainly it's something we have to consider, whether the constitutional limit was not reached. The Supreme Court seems to say one-on-one is about right, about it. I would... And obviously you went beyond that. I would submit to the Court two things on that. First of all, I assume that the Court's referring to the Roby v. McKesson case that just came down. Yes. The issue of punitive damages, excessive punitive damages was never raised by the appellant. Well, that's clear now. That's right. And I would submit that it's waived at this juncture. Well, if the Court, if the Supreme Court announces a new constitutional rule, we just close our eyes to it. Is that your position? No. No. I don't believe that the California Supreme Court was... No, I mean the Supreme Court of the United States... Yes. ...established a one-on-one as the, as what was provided by the Federal Constitution. That was the State Farm case that the Supreme Court decided in 2003... Yes. ...before this case was tried. True. At that point, the appellant was on notice that this was... They were. I'm not arguing they weren't on notice, but I'm saying we're on notice, too. Do we just, because the, this was not brought to the attention of this Court, we just say, well, it's a violation of the Constitution, we won't notice it? I suggest to this Court that any such argument, if in fact there was a constitutional argument to be made... Well, why isn't there one? I'm telling you right now... There may be one, and I'm... State Farm says one-on-one. Okay. State Farm says one-on-one under certain circumstances. Those circumstances aren't present in this case. What's the difference? In this case, well, if you look at the Roby v. McKesson case that interpreted State Farm, the managing agents had really not engaged in any malfeasance towards the plaintiff. What they had done was implemented a corporate-wide no-fault attendance policy, which didn't take into account disability-related absences, and so it was unlawful. But they harbored no ill will toward the plaintiff. The policy wasn't implemented to get at the plaintiff. They probably didn't even know who the plaintiff was. Also, what the court did in Roby was it took into account that there was a relatively high number of non-economic compensatory damages. I think it was a million dollars. And based on the facts that the managing agents really had harbored no ill will toward the plaintiff and a relatively high award of non-economic compensatory damages, the California Supreme Court held that under those circumstances, a one-to-one ratio was appropriate. Here, what we have is managing agents who targeted Mr. Lee for layoff based on his age, created a matrix to target him, and then essentially were untruthful about it. In addition, the non-economic compensatory damages were relatively low, only $50,000, I believe, as opposed to $1.something million in the Roby case, so that the award here would not offend notions of due process if it exceeded one-to-one. Now, if the court looks at the award, and I totaled it up, and including 7% prejudgment interest for 6.75 years, it does approximate a one-to-one ratio punitive to compensatory. And even if you do not consider the prejudgment interest, the ratio, I believe, is 1.4 to 1 punitive to compensatory damages, I would submit to the court that under the facts of this case, that does not offend notions of due process. Unless the panel has any other questions for me, I submit. Thank you. Thank you. We'll give you a couple of minutes for rebuttal. Thank you, Your Honor, and I'll be brief. With respect to Weaver and Nakamura, I would only remind the court that what the Supreme Court has said in White v. Ultramar and College Hospital is the intent of the legislature in modifying Civil Code 3294 has been to narrow the class of people whose conduct will submit a corporation to liability for punitive damages. That class of persons is the same type that's listed in the statute, officers and directors and managing agents. That means managing agents have to be at the level of a corporate officer or director. I don't think that people, corporate mid-level and lower-level managers who go out and violate a corporate policy ever think that they are, in fact, leading the charge of the corporation and setting it. I think counsel just a moment ago highlighted my point here. He, as I understood the argument, it was that, well, since Nakamura and Weaver and Molis were free to ignore TRW's written policy without corporate oversight, TRW's malfeasance in this case is they failed to take measures to see that that didn't occur. That's negligence. That's the corporation's conduct is nothing more than negligence, a failure to take reasonable action given a set of circumstances. On the Roby case, obviously, as the Court is aware, it's a very recent decision. It came down last week. I don't think there's any waiver involved. It was not. You didn't raise excessiveness before the trial court did. I can explain why you are. But you didn't. I mean, you didn't raise it, correct? State Farm was on the books at that time, correct? Yes. And I can respond to both of those. We didn't raise it because under the California law at the time, if you read the court of appeal decisions, the indication was a 3-to-1 or 4-to-1 ratio would pass muster. There's a Federal Constitution though, right? State Farm, I don't think, as I recall, and I think this was even noted in the Roby decision, State Farm, the comment in the State Farm decision was that a 1-to-1 ratio may well be the outer limit. And I think that's dictum where they're not deciding as a matter of law. You could have raised it, right? You could have raised it. You know, we see people, they raise everything. We get these briefs with, you know, a godly number of issues. I think. And we see public defenders. I mean, they repeatedly, repeatedly, repeatedly they'll raise an issue that we've decided and they say, well, we do it because we want to preserve it because the Supreme Court might change its view. I understand, Your Honor. And to the benefit of 20-20 hindsight, I would too. But I thought, I think at the time I would have been pushing the limits of advocacy given the California law as it was at the time. We're going to do it all the time. Thank you, Your Honor. Submit. All right. Thank you very much. And the court will recess until tomorrow morning. I'd appreciate it if my law clerks would pick up the briefs. Yeah. Thank you.
judges: Pregerson, Noonan, Paez